## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JANE DOE 1; JANE DOE 2; JANE DOE 3; JANE DOE 4; JANE DOE 5; and JANE DOE 6, | Case No.: 1:19-cv-07675-GBD |
| Plaintiffs, | THIRD AMENDED COMPLAINT |
| v. | JURY TRIAL DEMANDED |
| DARREN K. INDYKE AND RICHARD D. KAHN, in their capacities as co-executors of THE ESTATE OF JEFFREY E. EPSTEIN; ESTATE OF JEFFREY E. EPSTEIN and ROES 2-10, | |
| Defendants. | |

Plaintiffs Jane Doe 1, Jane Doe 2, Jane Doe 3, Jane Doe 4, Jane Doe 5, and Jane Doe 6 ("Plaintiffs"), by and through their attorneys, The Bloom Firm, bring this action against Defendants Darren K. Indyke and Richard D. Kahn, in their capacities as co-executors of the Estate of Jeffrey E. Epstein, and Roes 2-10 ("Defendants"). Plaintiffs allege upon knowledge concerning their own experience and upon information and belief as to all other matters.

## I.    OVERVIEW

1.    Jeffrey E. Epstein ("Epstein") was a serial sexual predator who exploited his wealth and power to fraudulently and forcefully entice young women into engaging in abusive commercial sex acts. Epstein sought to take advantage of Plaintiffs, who were each vulnerable, young women at the time of their assaults, through fraudulent, manipulative, and sometimes violent means to procure sexual

favors. Epstein permanently damaged Plaintiffs' lives and careers. Though Epstein is recently deceased, the trauma and pain he caused Plaintiffs remain.

2.       Through his third-party agents and his own actions, Epstein intimidated his victims by flaunting his wealth and power. Epstein invited his victims to his lavish homes, which displayed photographs of wealthy and powerful political figures, indicating that he had powerful government connections. Epstein also – both directly and indirectly – represented to his victims that he always had control over others, evidenced by his recruiters' and associates' compliance in the sexual abuse. Indeed, Epstein even threatened women with violence if they made any attempts to come forward with their stories. Any young woman entering his home and learning of his wealth, power, and connections would fear reporting him to the police or taking legal action against him before his death. Plaintiffs are no exception.

## II.       THE PARTIES

3.       Plaintiffs, victims of sex trafficking and molestation, have been identified by pseudonym because this matter is of a highly sensitive and personal nature, and public disclosure of their identities may subject them to further embarrassment, shame, and emotional harm.

4.       Plaintiff Jane Doe 1 is a United States citizen and a resident of Japan, domiciled in Japan.

5.       Plaintiff Jane Doe 2 is a United States citizen, domiciled in Maryland. She resides in Baltimore, Maryland.

6.       Plaintiff Jane Doe 3 is a United States citizen, domiciled in Virginia. She resides in Richmond, Virginia.

7.       Plaintiff Jane Doe 4 is a United States citizen, domiciled in Washington. She resides in Vancouver, Washington.

8.       Plaintiff Jane Doe 5 is a United States citizen, domiciled in New York. She resides in New York, New York.

9.       Plaintiff Jane Doe 6 is a United States citizen, domiciled in Wisconsin. She resides in Monona, Wisconsin.

10.     Defendant Darren K. Indyke is sued in his capacity as an appointed executor of the Estate of Jeffrey E. Epstein.

11.     Defendant Richard D. Kahn is sued in his capacity as an appointed executor of the Estate of Jeffrey E. Epstein.

12.     The identities and capacities of Defendants ROES 2 through 10 are presently unknown to Plaintiffs, and on this basis, Plaintiffs sue these Defendants by fictitious names. Plaintiffs will amend the Complaint to substitute the true names and capacities of the ROE Defendants when ascertained. Plaintiffs are informed, believe, and thereon allege that ROES 2 through 10 are, and were at all times relevant herein, employees and/or agents of Epstein.

## III.     JURISDICTION AND VENUE

13.     Epstein was a citizen of the United States domiciled in the U.S. Virgin Islands at the time of his death and maintained a residence in the Southern District of New York. Thus, Darren K. Indyke and Richard D. Kahn, as legal representatives of the Estate of Jeffrey E. Epstein, are deemed citizens of the U.S. Virgin Islands.

14.     This Court has jurisdiction over this suit pursuant to 28 U.S.C. § 1331 because this action involves claims brought under 18 U.S.C. §§ 1591 and 1595.

15.     The amount in controversy in this action exceeds the sum or value of $75,000.00, excluding interests and costs, and is between citizens of different states. Accordingly, jurisdiction is proper under 28 U.S.C. § 1332. The Court also has jurisdiction over this suit pursuant to 28 U.S.C. § 1367.

16.     On information and belief, this Court has personal jurisdiction over Defendants Darren K. Indyke and Richard D. Kahn, in their capacities as legal representatives of the Estate of Jeffrey E. Epstein, pursuant to New York Civil Practice Law and Rules ("C.P.L.R.") Sections 30l and 302 because Defendants operate in New York, transact business in New York, and own, use, or possess real property within New York.

17.     Venue is proper in this District under 28 U.S.C. § 1391(b) because the events or omissions giving rise to Plaintiffs' claim occurred in this District.

///

## IV.   FACTUAL ALLEGATIONS

18.     At all material times, Epstein was (or appeared to be) a man of extraordinary wealth who traveled frequently around the world, including New York, New York at 9 East 71st Street, New York, NY 10021; Palm Beach, Florida; and in the United States Virgin Islands.

19.     At all material times, Epstein was an adult male who was born in 1953 and died on August 10, 2019.

## JANE DOES 1 AND 2

20.     At all material times, Jane Doe 1 and Jane Doe 2 were aspiring female models and were also hostesses at The Coffee Shop, located at 29 Union Square West, New York, New York 10003.

21.     In or around June 2004, at The Coffee Shop, an anonymous woman ("Roe") approached Jane Doe 1 and offered her hundreds of dollars in cash in exchange for providing Epstein a massage in his mansion. Roe told Jane Doe 1 that her "boss" thought Jane Doe 1 was beautiful and that he liked to give young girls "opportunities."

22.     A few days later, Roe approached Jane Doe 2 at The Coffee Shop. Roe began the conversation by complimenting Jane Doe 2's physical appearance. Roe told Jane Doe 2 that her nice, wealthy client liked young, pretty girls to massage him. Roe then offered Jane Doe 2 hundreds of dollars to massage Epstein at his mansion. Roe also intimated that there may even be future opportunities to make more money.

23.     Shortly thereafter, Roe took Jane Doe 1, Jane Doe 2, and a mutual friend to a club. At this club, Roe told the women that she had worked for Epstein for a long time and that the job for which she was recruited simply entailed a brief massage. Based on these representations, both Jane Doe 1 and Jane Doe 2 accepted the offer.

24.     Jane Doe 1 and Jane Doe 2 were both reasonably excited and hopeful about the opportunity to make money now and in the future. Both women were struggling financially, so they reasonably believed that the opportunity to make

money by giving massages would and could provide much-needed financial support.

25.     After being reassured by Roe that the massage would not involve any unwanted touching, Jane Doe 1 arrived at Epstein's mansion in the Upper East Side of Manhattan, per Roe's instructions, and was escorted to a private room.

26.     While in the room, Jane Doe 1 massaged Epstein. During the massage, Epstein became increasingly more aggressive, made sexual advances, and masturbated. Epstein, forcefully and without warning, grabbed Jane Doe 1's breasts and vagina and then masturbated to completion. After Epstein ejaculated, he left the room. Before Jane Doe 1 left Epstein's mansion, she received hundreds of dollars. During this same visit, Roe offered Jane Doe 1 a job to scout other women for money. Jane Doe 1 refused the offer.

27.     Approximately two days after Jane Doe 1's visit, Jane Doe 2 met Roe near a small deli and/or cafe around the corner from Epstein's mansion, per Roe's instructions. Roe reiterated that Epstein would not touch her and that she would not have to undress for the massage. Roe again described Epstein as wealthy and kind. Jane Doe 2 agreed to meet Epstein with the understanding that he would not touch her and would provide her money after she provided him with a massage.

28.     Immediately following this conversation with Roe, Jane Doe 2 arrived at Epstein's Upper East Side mansion for the massage. At the mansion, Epstein utilized increasingly aggressive tactics once he was alone with Jane Doe 2. During the massage, Epstein told Jane Doe 2 to undress, and Jane Doe 2 reluctantly acquiesced. Epstein then asked Jane Doe 2 to strip naked. Fearing what would happen to her if she were to refuse his demands, Jane Doe 2 again acquiesced. Epstein then sexually molested her by forcefully touching Jane Doe 2's breasts and masturbating in front of her. Epstein then forcefully penetrated Jane Doe 2 with his hand and an object. Epstein then ejaculated. Before she left Epstein's home, Jane Doe 2 received hundreds of dollars.

29.     Per his *modus operandi,* Epstein's method of recruiting and enticing Plaintiffs, and his fraudulent conversion of the massage to molestation, intentionally

made Jane Doe 1 and 2 feel as if the incidents that took place in his mansion were not crimes. Through his recruiter, Epstein expressed that Jane Doe 1 and 2 would simply give him massages for pay. Epstein normalized the sexual abuse by staging the room where the abuse took place with a massage table. As a result, Jane Doe 1 and 2, barely over the age of 18, had reason to believe the massages were legitimate and reasonably relied upon Epstein's misrepresentation to their detriment. This was a deliberate and deceptive plan and scheme by Epstein, and carried out by Roe, to ensure that his victims were unaware that they were victims to avoid criminal and civil liability.

30.    Until Epstein's publicized July 2019 criminal indictment which notified Jane Doe 1 and 2 of the uncanny similarity between their experiences and those of Epstein's other victims described in the indictment, Jane Doe 1 and 2 had been unaware that they had become victims of the sordid sex-trafficking scheme, then-exposed by the media and federal government. As well, Jane Doe 1 and 2 were aware that a private right of action is stayed during the pendency of a criminal action under 18 U.S.C Section 1595(b)(1).

## JANE DOE 3

31.    At all relevant times, Jane Doe 3 was a minor under the age of 18. At all relevant times, Jane Doe 3 was an aspiring model in New York.

32.    In or around 1990, Jane Doe 3 met Epstein in New York, New York, when she was approximately 15 years old. On information and belief, Elite Model Management held casting calls in New York City wherein models were sent to meet with various Elite Model Management affiliates and clients, including photographers and casting directors. On information and belief, Epstein represented himself as a modeling photographer connected to Elite Model Management.

33.    On Jane Doe 3's first day of casting calls with her dream agency, Elite Model Management, she was excited and hopeful for the opportunity to work with renowned photographers and casting directors. This was the first casting call she ever attended.

34.     For her first casting call appointment, the agency's owner, John Casablanca, directed Jane Doe 3 to a residential address in Upper East Side Manhattan. Jane Doe 3 believed the appointment to be a legitimate casting call and was unaware of the identities of the homeowner, photographer, or any casting director at the time.

35.     When Jane Doe 3 arrived at the home, she was required to complete what she believed to be standard casting call paperwork, which required her size, age, height, and pager number. Epstein then introduced himself to Jane Doe 3 as a casting photographer.

36.     Almost immediately after this brief introduction, Epstein told Jane Doe 3 to remove her clothing. Jane Doe 3 complied because she believed removing her clothes was mandatory to complete the casting calls and to be competitive in the modeling industry. She wanted to advance her career, so she complied. Once Jane Doe 3 stripped to her underwear, Epstein took photographs of Jane Doe 3's near-naked body from different angles. He did so by fraudulently representing to Jane Doe 3 that he was a photographer and worked in the fashion industry.

37.     While she remained partially exposed, Epstein pushed Jane Doe 3 against a wall, pressing his body against hers, until she could not move. Jane Doe 3 froze in discomfort. She did not say anything because she reasonably relied on Epstein's and Elite Model Management's representations that Epstein was a legitimate photographer and believed the offensive touching may have been customary for casting calls.

38.     While Epstein had Jane Doe 3 pinned against the wall, he pulled down his pants and thrusted against her until he ejaculated. Jane Doe 3 felt harmed and violated.

39.     Traumatized, Jane Doe 3 immediately left New York following the casting call to return to her home in Connecticut, despite intending to remain in New York to further her modeling career. Out of fear, Jane Doe 3 did not attend another casting call for several weeks and thereafter chose to only work with secondary market agencies for years. Due in part to the psychological and emotional

scarring from her encounter with Epstein, Jane Doe 3 disenrolled from her high school while only in the tenth grade.

40.     Epstein's method of recruiting and enticing Jane Doe 3, and his fraudulent conversion of a casting call into molestation/rape, was intended to make Jane Doe 3 feel as if the molestation/rape that took place at the casting call was not a crime. Epstein knew a vulnerable minor like Jane Doe 3 would rely on his representations that the molestation/rape was legitimate. To her detriment, Jane Doe 3 did, in fact, rely on his representations. This was a deliberate plan and scheme by Epstein, and carried out by Epstein, to ensure that his victims were unaware that they were victims to avoid criminal and civil liability. Until Epstein's July 2019 criminal indictment, Jane Doe 3 had been unaware that, due to this incident, she had become victim of a sordid sex-trafficking scheme. As well, Jane Doe 3 was aware that a private right of action is stayed during the pendency of a criminal action under 18 U.S.C Section 1595(b)(1).

**<u>JANE DOE 4</u>**

41.     At all relevant times, Jane Doe 4 was a minor under the age of 18.

42.     Jane Doe 4 first met Epstein in or around 1984 in Hilton Head Island, South Carolina. On information and belief, Epstein had rented and/or leased a vacation home from Jane Doe 4's mother, a local real estate agent in Hilton Head Island.

43.     As was common in the area, Jane Doe 4 offered babysitting services to the tourists renting property from her mother. Jane Doe 4 was approximately 13 years old at the time when Epstein first hired Jane Doe 4 to work as a babysitter.

44.     When Jane Doe 4 arrived at Epstein's vacation rental in South Carolina, there were no young children to babysit. Instead, Epstein immediately offered 13-year-old Jane Doe 4 alcohol and drugs. Impressionable and shocked, Jane Doe 4 accepted Epstein's offering. Epstein raped Jane Doe 4 for the first time later that night.

45.     Epstein continued the same pattern of abuse and assault of Jane Doe 4 over the next several years. During summers, Epstein visited Hilton Head and hired

Jane Doe 4 for her "babysitting services." In reality, Epstein was supplying a teenage girl alcohol and illicit drugs and subsequently assaulting and violent raping her.

46.     On information and belief, Epstein took nude photographs of Jane Doe 4. Jane Doe 4 was not made aware when the photos were taken. However, when Jane Doe 4 saw photographs of her own nude body and asked Epstein to return them, Epstein became violent and refused to provide these photographs to Jane Doe 4.

47.     Epstein's sexual abuse of Jane Doe 4 continued across state lines. On information and belief, Epstein flew Jane Doe 4 to New York, New York on approximately three of four occasions. During these trips, Epstein brought Jane Doe 4 to intimate gatherings with other prominent, wealthy men. It was later made clear to Jane Doe 4 that Epstein brought her to these parties to essentially offer her up as "fresh meat" to these other men.

48.     Jane Doe 4 was brutally and forcibly battered, assaulted, and raped by these other men she met through Epstein. On one occasion, one of these prominent men forcibly slapped Jane Doe 4 in the face after she was forced to perform oral sex on him. This same man forcibly raped her, penetrating her both vaginally and anally. On information and belief, Epstein was aware of and, indeed encouraged, the assault of Jane Doe 4 by these other men.

**JANE DOE 5**

49.     At all relevant times, Jane Doe 5 resided and worked in New York, New York.

50.     In or around September 2003, Jane Doe 5 first met Epstein. At the time, Jane Doe 5 was interviewing for a position as an executive and/or personal assistant for Epstein's close friend. To protect Jane Doe 5's anonymity, Jane Doe 5's employer will herein be referred to as "Epstein Associate 1."

51.     Although Jane Doe 5 was interviewing for a position to work for Epstein Associate 1, it was made clear from this initial interview that Epstein would control a substantial portion of Jane Doe 5's employment and, further, that

maintaining her physical appearance would be a priority. Indeed, Epstein Associate 1 conducted the initial interview in Epstein's office and spent a substantial amount of time during the interview discussing Epstein, emphasizing to Jane Doe 5 that Epstein was a very powerful man. Jane Doe 5 was hired shortly after her initial interview.

52.     Epstein began his systematic, near constant abuse of Jane Doe 5 from their very first interaction. Jane Doe 5 first met Epstein at the office, wherein Epstein commented to her that she had a "good body" and that he liked her small breasts. To emphasize this point, Epstein then groped Jane Doe 5's breasts in the middle of the office. Shocked and appalled, Jane Doe 5 did not know how to respond.

53.     Epstein's inappropriate conduct and statements became a normal part of Jane Doe 5's job. As part of her job duties, Jane Doe 5 regularly completed various tasks for Epstein. Jane Doe 5 managed and organized a household renovation project for Epstein in his New York residence. She once was ordered to send a package of cookies to Epstein at his Virgin Islands residence. She also prepared weekly status reports for Epstein, providing updates to Epstein on various projects he had assigned her during the week affecting his day to day life. Jane Doe 5 spoke to Epstein over the phone nearly every day. Jane Doe 5 understood that she had to prioritize any tasks Epstein had assigned her. Indeed, if Epstein's assignment conflicted with a task that Epstein Associate 1 had assigned her, Epstein replied: "But I pay you." Jane Doe 5's salary was paid through Nes, LLC – a corporation believed to be owned, managed, controlled, and/or maintained by Epstein. Thus, from the very beginning, Jane Doe 5 understood that Epstein controlled a substantial part of her employment.

54.     Epstein created a hyper-sexualized work environment for Jane Doe 5. In each of their phone conversations, Epstein made inappropriate comments to Jane Doe 5, such as interrupting her to ask what she was wearing. Epstein once told Jane Doe 5 to take off her shirt, so he could compare her breasts with Epstein Associate 1's breasts. On multiple occasions, Epstein groped Jane Doe 5's breasts and

commented that he enjoyed her "small breasts" or words to that effect. Epstein also repeatedly attempted to insert his fingers in Jane Doe 5's mouth, requiring her to forcibly push his hand away. On one occasion, Epstein approached Jane Doe 5 while she was speaking with another employee and forcibly grabbed Jane Doe 5's vagina. Jane Doe 5 immediately jumped away. In response, Epstein simply carried on the conversation with the other employee as if nothing had happened. The abuse was constant.

55.     Jane Doe 5 tried to tell Epstein to stop. When he made unwelcome comments to her, Jane Doe 5 responded with words to the effect of: "Inappropriate, Jeffrey" or "Not the time and place, Jeffrey." When Epstein physically touched, groped, or assaulted her, Jane Doe 5 either forcibly removed his hands or immediately stepped back. Epstein never apologized for his actions or acknowledged the boundaries Jane Doe 5 attempted to create. Jane Doe 5's lack of consent to his conduct was entirely irrelevant to Epstein.

56.     Epstein also asserted control over Jane Doe 5's physical appearance. Epstein regularly commented on Jane Doe 5's diet. When meals were ordered for the office, Epstein would cancel Jane Doe 5's order if he did not approve of what she had ordered. Epstein forced Jane Doe 5 to exercise at his private gym, indicating to her that she had to maintain a certain physical appearance to keep her employment. Epstein also insisted on taking Jane Doe 5 out to buy clothes and even, on occasion, to hair salons, where Epstein instructed the hair stylist how he wanted Jane Doe 5's hair to be cut. The clothes Epstein purchased for Jane Doe 5 were inevitably tight-fitting and low cut. Epstein Associate 1 made it clear to Jane Doe 5 that she was expected to wear these clothes anytime Epstein would be around the office. Epstein presented these purchases under the guise of nice gestures which were part of Jane Doe 5's professional development; in reality, Epstein was fraudulently recruiting, enticing, and grooming Jane Doe 5 to become one of his many victims.

57.     As part of her job as assistant to Epstein Associate 1, Epstein Associate 1 directed Jane Doe 5 to travel with Epstein on his various trips, including trips to

Epstein's residence located in the Virgin Islands. On her second trip to the island, Jane Doe 5 was directed to go to Epstein's bedroom. Epstein was wearing a bathrobe when Jane Doe 5 walked into the room. After a few minutes, Epstein directed Jane Doe 5 to lay next to him on the bed. Epstein then initiated a personal conversation with Jane Doe 5 – asking pointed questions about her body, her measurements, and her sex life. Jane Doe 5 felt uncomfortable, yet trapped. Jane Doe 5 knew Epstein controlled the only means of travel to and from the island and all communications, so she stayed in bed with him and answered his questions until he let her go.

58.  Following, Jane Doe 5 had three nonconsensual sexual encounters with Epstein, all of which occurred in New York, New York.

59.  On information and belief, Epstein directed Epstein Associate 1 to summon Jane Doe 5 to his home. Upon arriving at Epstein's residence in New York, Jane Doe 5 was led up the stairs to a small, dark room with a massage table. Epstein then entered the room and immediately directed Jane Doe 5 to get undressed. Jane Doe 5 complied, but kept her underwear on. Epstein then directed Jane Doe 5 to get on the massage table and massaged her. Epstein then aggressively and forcefully massaged Jane Doe 5's breasts. Jane Doe 5 was terrified and frozen.

60.  Shortly after Epstein's massage began, Jane Doe 5 saw another unknown woman enter the room. The woman was completely naked. Epstein directed the woman to perform oral sex on Jane Doe 5, while he watched and continued to forcefully massage Jane Doe 5's breasts. Soon after Epstein ejaculated, he left the room. While dressing, Jane Doe 5 saw that Epstein had left cash by the small sink in the room.

61.  On the second occasion, Epstein Associate 1 again summoned Jane Doe 5 to Epstein's New York residence. Again, Jane Doe 5 was escorted to the small, dark room upstairs with the massage table. Epstein then ordered Jane Doe 5 to take off her clothes and to lay down on the massage table. Terrified, Jane Doe 5 complied. Another woman came into the room. Epstein directed the woman to perform oral sex on Jane Doe 5 while forcibly holding Jane Doe 5 down on the table

as Jane Doe 5 began to squirm. When Epstein had finished the assault, Epstein immediately left the room and, again, left money on the small sink for Jane Doe 5.

62.     On the third and last occasion, Epstein himself directly summoned Jane Doe 5 to his residence. As Epstein controlled her employment and was clearly a wealthy, powerful man, Jane Doe 5 believed she had no other option but to comply. When she arrived at the residence, Jane Doe 5 was immediately taken to a small room. Epstein entered the room wearing a bathrobe. Epstein then directed Jane Doe 5 to massage him. He opened his bathrobe and was naked. He masturbated in front of her on the table while he continued to instruct Jane Doe 5 to massage his legs and his chest. Epstein then began to grope Jane Doe 5's breasts while she massaged him. Epstein placed his hand behind Jane Doe 5 and tried to bring her closer to him. Jane Doe 5 resisted and was able to push back. Epstein became more forceful, pulling Jane Doe 5 up onto the table, so that she now straddled his thighs. Epstein forcibly pulled Jane Doe 5's body onto his pelvis. Jane Doe 5 tried pushing herself way, but Epstein placed his hands on her shoulders and neck area, pushing Jane Doe 5 down onto his penis. Epstein held Jane Doe 5's wrists while he raped her. Jane Doe 5 was left naked, abused and alone in the small, dark room on the second floor.

63.     Further, Epstein regularly threatened Jane Doe 5, her close friends, and her family during her employment with him and Epstein Associate 1. In a clear effort to silence and normalize his behavior, Epstein regularly commented with words to the effect: "We're all family here. What happens in the family stays in the family." The threats became more aggressive. In an obvious effort to intimidate and coerce Jane Doe 5 into silence and prevent her from pursuing any claims against him, Epstein once told Jane Doe 5 (with words to the effect): "You will never work in New York again and you'll have to crawl back to [Jane Doe 5's home state]." Other times, to maintain Jane Doe 5's silence, Epstein stated: "You are nothing without this job. I'll see to it that you will never work in New York again."

64.     Epstein would also reference his powerful friends and business partners in these threats, once commenting to Jane Doe 5 that his attorney would

"burn you" – or words to that effect. Epstein also made it known that he had a friendly relationship with law enforcement. Indeed, Jane Doe 5 often saw a police placard displayed in Epstein's vehicles that, on information and belief, permitted him to avoid parking tickets.

65.     Epstein did not limit his threats to Jane Doe 5; he would also often threaten Jane Doe 5's boyfriend at the time as well. Epstein once commented – with words to the effect – that he would "ruin" her boyfriend.

66.     In his most direct threat, Epstein commented to Jane Doe 5 that: "I will burn you. I will [expletive] burn you. I will hunt you down." Fearing for her life and the lives of her friends and family, Jane Doe 5 left her job soon after this latest threat.

67.     This campaign of continued harassment and intimidation continued well after Jane Doe 5's employment ended. In January 2011, Jane Doe 5 attended a wedding wherein one of Epstein's close, known associates was in attendance. This associate approached Jane Doe 5 and offered Jane Doe 5 another opportunity to work for Epstein Associate 1 and Epstein. The associate represented to Jane Doe 5 that she had Epstein's authority to make this offer.

68.     In approximately 2013, Epstein Associate 1 recruited Jane Doe 5 with a similar offer of employment. Because Jane Doe 5 had worked for Epstein Associate 1, Jane Doe 5 depended on Epstein Associate 1 to provide recommendations for other prospective employers. Epstein Associate 1 knew this and sought to take advantage of Jane Doe 5's dependence. When Jane Doe 5 asked Epstein Associate 1 for a recommendation, Epstein Associate 1 told Jane Doe 5 (with words to the effect) that: "Our door is always open. You are welcome to come work for us at any time." Jane Doe 5 immediately understood that the "us" referred to Epstein.

69.     Though under the guise of another employment opportunity, Jane Doe 5 understood that the "offers" to work for Epstein were attempts to entice Jane Doe 5 into providing sexual favors in exchange for financial advancement. Jane Doe 5 refused both offers.

14

70.     Each threat and employment offer was part of an intentional, malicious campaign of intimidation and coercion by Epstein to prevent Jane Doe 5 from taking any legal action against him and coming forward with her story. Given the very explicit nature of Epstein's threats to herself, her career, and to her family and friends, Jane Doe 5 could not come forward out of fear of retaliation from Epstein until after his death. Given Epstein's vast wealth and political connections, Jane Doe 5 reasonably feared for the safety of her family, her friends, and herself.

**JANE DOE 6**

71.     At all relevant times, Jane Doe 6 was an aspiring female model who resided and worked in multiple cities from May 2009 to May 2012, including New York, New York, Palm Beach, Florida, and Miami, Florida.

72.     In or around June and July 2009, Epstein paid Jane Doe 6's employers – modeling agency, MC2 Model Management, LLC, its affiliates, and part owner of MC2, Jean-Luc Brunel ("Brunel") – to send Jane Doe 6 to Epstein's Palm Beach, Florida, mansion for modeling "photoshoots" at the mansion. Epstein used the photoshoot to entice Jane Doe 6 with promises of career success, fraudulently mislead Jane Doe 6 into believing she would engage in modeling activities in Florida, and lure her to his home and office to be sexually assaulted. Indeed, Jane Doe 6 was photographed to "advance" her modeling career by one of Epstein's recruiters. At the time, Epstein was already registered as a convicted sex offender for the crimes of solicitation of prostitution and solicitation of prostitution with a minor. Much of the allegations giving rise to Epstein's criminal conviction took place at the very residence Jane Doe 6 was sent to for a "photoshoot." Jane Doe 6 was initially unaware of Epstein's prior conviction, given Epstein's lavish and seemingly unencumbered lifestyle. When Epstein eventually discussed his prior conviction, he described it as a joke. He emphasized how many great attorneys he had available to him, described the "great" conditions in jail, and even joked about conjugal visits while in jail. Jane Doe 6 was led to believe that justice would not be available against a man like Epstein.

73.     While in Florida for one of the "photoshoots," Epstein told Jane Doe 6 that he would help her modeling career, and subsequently asserted control over Jane Doe 6's physical appearance. Epstein told Jane Doe 6 that she should remove the mole from her face if she wanted to be successful and that he would pay for it, and then scheduled an appointment for the removal. Epstein also insisted on buying Jane Doe 6 clothes, lingerie, and shoes allegedly for modeling castings and photoshoots. Epstein presented these gifts under the guise of nice gestures, which were part of Jane Doe 6's professional development. In reality, Epstein was further fraudulently recruiting, enticing, and grooming Plaintiff to become one of his many victims.

74.     In or around July 2009, Epstein asked Jane Doe 6 if she needed money as a starving model and that he would provide her financial assistance by employing her as a "secretary" for his Florida nonprofit office. Jane Doe 6 needed to advance in her career and support her family financially, so she relied on Epstein's promises to provide her career opportunities.

75.     In or around August and September 2009, Jane Doe 6's modeling agency moved her from her New York residence to a MC2 model dormitory in Miami, Florida, so that Epstein could have easier access to her. Epstein used Jane Doe 6's close proximity to his advantage and often summoned Jane Doe 6 to his Florida home and office.

76.     Following, in or around fall 2009, Epstein arranged for Jane Doe 6 to travel from her residence in Miami, Florida, to his Palm Beach, Florida, home and office for the "secretary" job every week. Although Epstein informed Jane Doe 6 that she would be a "secretary," Epstein did not assign Jane Doe 6 job duties and scheduled her to work exclusively during the weekends when they were alone at the office. Instead of working as a "secretary," Epstein told Jane Doe 6 that she could make additional money giving massages and forced Jane Doe 6 to learn from a female masseuse how to perform massages on him. Jane Doe 6 reasonably believed that the opportunity to make money by giving massages would and could provide much-needed financial support.

77.    Tragically, Epstein used the massages to sexually assault Jane Doe 6. Amidst the massages-turned-sexual assaults, the masseuse repeatedly told Jane Doe 6 that Epstein was "amazing" and that he would be a great "ally" for Jane Doe 6's career growth. Following each massage-turned-sexual assault, Epstein provided Jane Doe 6 hundreds of dollars.

78.    On one occasion in September 2009, Epstein told Jane Doe 6 to follow him to the massage room in the nonprofit office and to massage his body. Epstein then told Jane Doe 6 to take off her shirt and he touched her thighs, vagina, and breasts. Next, Epstein exposed his bare penis and masturbated.

79.    On another occasion in late 2009, Epstein summoned Jane Doe 6 to his bedroom in his Palm Beach, Florida. Epstein wore a bathrobe, but was naked underneath. He told her to give him a full body massage. Epstein then touched Jane Doe 6's vagina and told her that he wanted to show her what her face should look like when she posed for photographs. He also told her that, if she learned how to express her sexuality and look as if she was orgasming in photographs, she would have more success as a model. On an additional occasion, Epstein summoned Jane Doe 6 to his bedroom in Florida and forced her to use a vibrator for sexual purposes. He told her that he wanted to teach her how to orgasm and masturbate.

80.    This inappropriate touching and masturbation during massages continued almost weekly for approximately two months. The fraudulent massages eventually worsened leading to Epstein forcing Plaintiff into unwanted sexual intercourse. Epstein intentionally led Jane Doe 6 to believe that he controlled a substantial portion of her livelihood. Epstein paraded his close personal relationship with Brunel and intimidated on multiple occasions that he even owned MC2. Jane Doe 6 felt she had no other option but to submit when Epstein summoned her to his home or office. She had to endure the sexual assaults in order to advance in her career. Nevertheless, Jane Doe 6 wanted the abuse to end so badly that she would hope to have a casting call or become sick on the weekends, so that she would not have to go "work" at Epstein's office or home.

81.     The non-consensual, fraudulent sexual assaults continued into 2010 and 2011 at Epstein's New York Upper East Side mansion throughout in or around 2010 and 2011.

82.     Throughout in or around 2011, Jane Doe 6 received emails directly from Epstein and from Epstein's assistant requesting that Plaintiff travel to Epstein's New York home. Epstein threatened Jane Doe 6 if she did not abide by his requests. In one email in or around April 2011, Epstein was upset that Jane Doe 6 denied his request to see him, so he told her: "[This] is not something i will accept again (sic)." In or around June 2011, Epstein emailed Brunel requesting that Brunel bring Jane Doe 6 to the Caribbean. Epstein offered this invitation to Plaintiff in order to sexually assault her on his Caribbean island.

83.     Although the last massage-turned-sexual assault occurred in or around July 2011, Epstein continued to recruit Plaintiff until the end of 2012. In an email, Epstein told Jane Doe 6: "[I]f you want to earn money from massage, so you don't feel its a gift, i would like that (sic)." At the time, Epstein also asked Jane Doe 6 to recruit other women to give him "massages." She refused.

84.     Per his *modus operandi,* Epstein's method of recruiting and enticing Jane Doe 6, firsthand and through his recruiters and his fraudulent conversion of the massage to molestation and sexual intercourse, intentionally made Jane Doe 6 feel as if the incidents that took place in his mansions and office were not crimes. Epstein normalized the sexual abuse by staging the room where the abuse took place with a massage table. As a result, Jane Doe 6, barely over the age of 18, had reason to believe the promises of career success and massages were legitimate and reasonably relied upon Epstein's misrepresentation to her detriment. This was a deliberate and deceptive plan and scheme by Epstein, and carried out by his recruiters, to ensure that victims were unaware that they were victims to avoid criminal and civil liability.

///

///

///

## V.    DAMAGES

85.    As a direct result of the sexual assault by Epstein, Plaintiffs have suffered, and continue to suffer, from psychological damages, including, but not limited to, depression, anxiety, anger, flashbacks, and nightmares.

86.    Plaintiffs also suffered psychological trauma affecting their abilities to generally function and several areas of their lives, including but not limited to their personalities, self-esteem, sexualities, relationships, and careers.

87.    Further, for the undetermined future, Plaintiffs must relive their sexual assault everyday due to the inescapable coverage of Epstein's federal criminal sex-trafficking case.

88.    Moreover, until recently, Plaintiffs' psychological damages have been debilitating, and have prevented them from understanding and asserting their legal rights. Additionally, Plaintiffs have feared and have been intimidated by Epstein, his wealth, his close connections to Donald Trump, Bill Clinton, Alan Dershowitz and other powerful political, business and legal leaders, and have feared retaliation. As a result, Plaintiffs were deprived of the opportunity to commence this lawsuit before Epstein's death. Upon Epstein's death, Plaintiffs felt less threatened and a sense of freedom.

89.    However, Plaintiffs' distressing experiences at the hands of Epstein will affect them for their entire lives.

## COUNT I

## Violation of The Trafficking Victims Protection Act 18 U.S.C. §1591
## (All Plaintiffs Against All Defendants)

90.    Plaintiffs repeat and re-allege each and every allegation as set forth in the preceding paragraphs as if set forth in full herein.

91.    Epstein recruited and enticed Plaintiffs by initiating a professional relationship with them. At times on his own volition and at other times through his recruiters, Roes 2-10, Epstein invited and recruited (1) Plaintiffs Jane Does 1, 2, and 6 to provide him "massages" for money – the payment of money being of value to the Plaintiffs; (2) Plaintiffs Jane Doe 3, 5, and 6 to feign career advancement

opportunities, which were of value to Plaintiff; and (3) Plaintiff Jane Doe 4 to provide "babysitting" for money – the payment of money being of value to the Plaintiff. A meeting with a wealthy man like Epstein was of considerable value for impressionable minors and aspiring, financially vulnerable female models and professionals.

92.     Based upon the representations by Epstein and Roes 2-10, these invitations reasonably led Plaintiffs to believe there may be future earnings or professional opportunities for Plaintiffs if they accepted Epstein's invitations.

93.     Plaintiffs reasonably relied upon the monetary promises and offers made by Epstein. In fact, Plaintiffs only accepted the invitations by Epstein and Roes 2-10 because Plaintiffs understood the invitations to be an opportunity to gain money, career advancement, or objects of value.

94.     At the outset of initiating his relationship with Plaintiffs, Epstein knew that he would make fraudulent and enticing offers for harmless "massages," "babysitting" opportunities, "employment" opportunities, or "casting calls." He made these offers knowing he would then sexually touch Plaintiffs for his own sexual gratification. He knew his offers of hundreds of dollars would convince Plaintiffs to engage in massages or accept his offers so that he could convert the massages into molestation. Similarly, Epstein knowingly and fraudulent posed as a fashion photographer and pretended to need babysitting services to isolate Plaintiffs to be able to then sexually assault them.

95.     Once he knowingly recruited and enticed Plaintiffs, Epstein then engaged in commercial sex acts with Plaintiffs by forcibly fondling them, including their breasts and/or genitals, for sexual gratification under the fraudulent guise of career advancement, "babysitting" opportunities, or massages in exchange for money.

96.     Epstein intended that his fraud and force cause sex acts to take place.

97.     Roes 2-10, as Epstein's recruiters, knowingly and intentionally conspired with Epstein to facilitate the fraud and sexual abuse of Plaintiffs.

98.     Plaintiffs initially complied with Epstein's orders during the fraudulent acts because they believed they were part of the "massages," and "professional opportunities." They believed that they had to engage in these practices in get paid, receive objects of value, or obtain career advancement. When Epstein then began to touch Plaintiffs in an aggressive, sexual manner, Plaintiffs were terrified and froze. Indeed, through his fraudulent representations, Epstein had isolated each of the Plaintiffs to overpower or otherwise control them. He held himself out as a wealthy, powerful man. Plaintiffs felt they had no other choice but to comply with this man's orders.

99.     Epstein's promises, as sometimes relayed by Roes 2-10, were made in relation to the payment for massage services, career advancements, and objects of value, which affects interstate commerce. Epstein's exchange of massage career opportunities for sex acts has a substantial effect on interstate commerce.

100.   Epstein's use of his position as a powerful, wealthy man to otherwise engage in touching with young women was for the purpose of his own sexual gratification.

101.   On information and belief, the fraudulent "massages" and "professional opportunities" were routinely utilized by Epstein to engage in sex acts with Plaintiffs. In fact, Epstein used this precise fraud to engage in commercial sex acts with multiple young, female victims, as evidenced by his 2008 Florida solicitation of prostitution conviction and recent 2019 criminal indictment for sex trafficking.

102.   As a result of Defendant Epstein's heinous and willful conduct, Plaintiffs are entitled to compensatory damages, punitive damages, attorney's fees, costs, and all other appropriate relief.

///

///

///

## COUNT II

## SEXUAL BATTERY

## (Plaintiffs Jane Doe 1, Jane Doe 2, Jane Doe 5, and Jane Doe 6 Against All Defendants)

103.   Plaintiffs repeat and re-allege each and every allegation as set forth in the preceding paragraphs as if set forth in full herein.

104.   Epstein intentionally committed battery by sexually assaulting Plaintiffs Jane Doe 1, Jane Doe 2, and Jane Doe 5 when they were young women. As set forth herein, Epstein intentionally sexually assaulted and touched Plaintiffs in an offensive and sexual manner without their consent.

105.   Epstein's actions constitute sexual offenses as defined under New York Penal Law § 130 *et seq.*, including but not limited to Article 130.35, as Epstein sexually assaulted Plaintiffs by forcible compulsion within 20 years of filing this Complaint. *See* N.Y.C.P.L.R. § 213-C.

106.   A criminal action against Epstein with respect to the same sex trafficking enterprise from which Plaintiff's claim arises was terminated on August 29, 2019, less than one year prior to the filing of this Complaint. *See* N.Y. C.P.L.R. § 215(8)(a).

107.   As a direct and proximate result of these Epstein's actions, Plaintiffs were caused to suffer and continue to suffer personal injury, debilitating and extreme emotional trauma, and severe humiliation, some or all of which may be permanent in nature and which will require continued psychological counsel and care.

## COUNT III

## SEXUAL BATTERY OF A MINOR

## (Plaintiffs Jane Doe 3 and Jane Doe 4 Against All Defendants)

108.   Plaintiffs repeat and re-allege each and every allegation as set forth in the preceding paragraphs as if set forth in full herein.

109.   At all relevant times herein, Plaintiffs Jane Doe 3 and Jane Doe 4 were minors.

110.   Epstein made violent, harmful and offensive sexual contact against Plaintiffs including, but not limited to, forcibly massaging and groping Plaintiffs' breasts, forcing his erect penis against their persons, and raping Plaintiffs. Such acts constitute sexual offenses committed against a child less than eighteen years of age as defined under New York Penal Law § 130 *et seq.*

111.   A criminal action against Epstein with respect to the same sex trafficking enterprise from which Plaintiff's claim arises was terminated on August 29, 2019, less than one year prior to the filing of this Complaint.  *See* N.Y. C.P.L.R. § 215(8)(a).

112.   Plaintiffs did not consent to Epstein's harmful and offensive contact.

113.   Epstein acted intentionally and/or with deliberate indifference and callous disregard of Plaintiffs' rights and physical and emotional safety and wellbeing.

114.   The conduct of Epstein was extreme, outrageous, and beyond the bounds of common decency.

115.   As a direct and proximate result of these attacks, Plaintiffs were caused to suffer and continue to suffer personal injury, debilitating and extreme emotional trauma, and severe humiliation, some or all of which may be permanent in nature and which will require continued psychological counsel and care.

## COUNT IV
## SEXUAL ASSAULT OF A MINOR
### (Plaintiffs Jane Doe 3 and Jane Doe 4 Against All Defendants)

116.   Plaintiffs repeat and re-allege each and every allegation as set forth in the preceding paragraphs as if set forth in full herein.

117.   At all relevant times herein, Plaintiffs Jane Doe 3 and Jane Doe 4 were minors.

118.   Epstein intended to deprive and did deprive Plaintiffs of their freedom of movement by use of physical barriers, force, threats of force, menace, deceit, and unreasonable duress. Such acts constitute sexual offenses committed against a child less than eighteen years of age as defined under New York Penal Law § 130 *et seq.*

119.   A criminal action against Epstein with respect to the same sex trafficking enterprise from which Plaintiff's claim arises was terminated on August 29, 2019, less than one year prior to the filing of this Complaint.  *See* N.Y. C.P.L.R. § 215(8)(a).

120.   Plaintiffs did not consent to Epstein's acts, which were objectively unreasonable.

121.   As a direct and proximate result of Epstein's conduct, as alleged herein, Plaintiffs have suffered, and will continue to suffer, the damages herein mentioned, in an amount according to proof.

122.   As a direct and proximate result of these attacks, Plaintiffs were caused to suffer and continues to suffer personal injury, debilitating, and extreme emotional trauma, and severe humiliation, some or all of which may be permanent in nature and which will require continued psychological counsel and care.

## COUNT V
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (All Plaintiffs Against All Defendants)

123.   Plaintiffs repeat and re-allege each and every allegation as set forth in the preceding paragraphs as if set forth in full herein.

124.   As a direct result of these allegations as stated, Epstein committed intentional infliction of emotion distress against Plaintiffs.

125.   Epstein's actions, as set forth herein, constitute extreme and outrageous conduct that shocks the conscience. Epstein's plan to recruit, entice, and assault Plaintiffs goes beyond all possible bounds of decency and is intolerable in s civilized community. Such acts constitute sexual offenses committed against a child less than eighteen years of age as defined under New York Penal Law § 130 *et seq.*

126.   Epstein knew or disregarded the substantial likelihood that these actions would cause Plaintiff severe emotional distress.

127.   A criminal action against Epstein with respect to the same sex trafficking enterprise from which Plaintiff's claim arises was terminated on August

29, 2019, less than one year prior to the filing of this Complaint. *See* N.Y. C.P.L.R. § 215(8)(a).

128.   As a direct and proximate result of Epstein's actions, Plaintiffs were caused to suffer and continue to suffer personal injury, debilitating and extreme emotional trauma, and severe humiliation, some or all of which may be permanent in nature and which will require continued psychological counsel and care.

## PRAYER FOR RELIEF ON CLAIMS

WHEREFORE, Plaintiffs pray that this Court:

A.   Award Plaintiffs all of their damages under The Trafficking Victims Protection Act 18 U.S.C. § 1595, the civil remedy for violation of The Trafficking Victims Protection Act 18 U.S.C. § 1591, and common law, including compensatory damages and punitive damages in an amount of $100,000,000.00 or in an amount to be determined at trial.

B.   Award Plaintiffs all attorney's fees, costs and expenses available under law;

C.   Award Plaintiffs all pre-judgment interest and post judgment interest available under law; and

D.   Award Plaintiffs such additional and further relief as this Court may deem just and proper.

///

///

///

## VII.   JURY DEMAND

Plaintiffs demand a trial by jury on all issues triable of right by jury.

DATED: June 17, 2020

Respectfully submitted,

**THE BLOOM FIRM**

By:   <u>/s/ Arick Fudali</u>
        Lisa Bloom
        Arick Fudali
        Colleen Mullen, pro hac vice
        Teri Gibbs, pro hac vice
        Attorneys for Plaintiffs
        85 Delancey St., Ste. 29
        New York, NY 10002
        (818) 914-7397